**RAYMOND WEIL, S.A., Plaintiff,**

v.

**Charlize THERON and Denver & Delilah Films, Inc., Defendants.**

**No. 07 Civ. 1786(CM).**

United States District Court, S.D. New York.

Sept. 30, 2008.

---

David Jaroslawicz, Jaroslawicz & Jaros, LLC, New York, NY, for Plaintiff.

Douglas F. Broder, Rebecca Louise Misner, K&L Gates LLP (NYC), New York, NY, Mark D. Baute, David Crochetiere, Jeffrey A. Tidus, Patrick M. Maloney, William T. Drescher, Baute & Tidus LLP, Los Angeles, CA, for Defendants.

MEMORANDUM DECISION AND ORDER DISPOSING OF ALL PENDING MOTIONS AND CROSS MOTIONS FOR SUMMARY JUDGMENT

McMAHON, District Judge.

Plaintiff Raymond Weil, S.A. filed this suit against defendants Charlize Theron and Denver & Delilah Films, Inc. seeking damages for alleged breaches of an endorsement contract and for fraud.

Before this Court are the parties' cross motions for summary judgment. Raymond Weil moves for judgment in its favor on its claim for breach of contract. Theron and Denver & Delilah Films move for summary judgment dismissing all the claims asserted against them.

Both motions are granted in part and denied in part.

## I. Background

Unless otherwise indicated, the following facts are undisputed.

### A. The Parties

#### 1. Plaintiff Raymond Weil

Raymond Weil ("RW") is a Swiss corporation, with its general place of business in Geneva, Switzerland. It manufactures and sells high-end luxury watches in countries around the globe. (Pl.'s Rule 56.1 Statement ¶ 1; Eilender Decl. Ex. A (hereinafter "Compl." ¶ 2)).

#### 2. Defendant Charlize Theron

Charlize Theron ("Theron") is an Oscar-winning actress and entertainer. (Defs.' Rule 56.1 Statement ¶¶ 2, 3).

#### 3. Defendant Denver & Delilah Films, Inc.

Denver and Delilah Films ("DDF") is a California corporation owned and operated by Theron. (Defs.' Resp. to Pl.'s Rule 56.1 Statement ¶ 3). It acts as both a film production company and a so-called "loan-out" corporation. A loan-out corporation enters into agreements whereby Theron (the "Artist") renders services of various kinds to third-parties (i.e. is "loaned out" to them). (Defs.' Rule 56.1 Statement. ¶¶ 3, 4.)

### B. The Agreement

On or about May 17, 2005, Raymond Weil entered into an agreement (the "Agreement") with DDF, whereby RW agreed to pay to DDF three million dollars in exchange for the use of Theron's image in a world-wide print media advertising campaign for Raymond Weil's "Shine" watch collection. (Pl.'s Rule 56.1 Statement. ¶ 4).

For our purposes, the relevant provisions of the Agreement are as follows:

Paragraph 8. Exclusivity

As of the signing of this Agreement, Artist [Theron] commits not to wear publicly any other watches other than RW watches during the Term. Additionally, Artist hereby agrees that during the Term she shall not endorse or advertise watches or jewelry for any other person, entity or company. Furthermore, Artist agrees that she will not endorse or advertise watches or jewelry for any other person, entity or company, including for charity....

Notwithstanding the foregoing, RW acknowledges and agrees that Artist is permitted to wear jewelry of her choice in public and to awards shows during the Term.

Additionally, Artist may be asked to wear non-RW watches as part of her performance in a feature film and/or television show and that such action by Artist shall not be deemed a breach by Artist, provided however, no merchandising or commercial tie-in campaign shall be allowed in connection with non-RW watches utilizing her name, voice and/or likeness in connection with such film or television show that is released and/or broadcast during the Term.

This contract does not prevent RW for [sic] using other artists or celebrities to endorse its products. However, RW agrees that Artist shall be the sole female artist to endorse RW during the Term in Europe and the United States. (Eilender Decl. Ex. F. (hereinafter the "Agreement") ¶ 8.)

In the event of a breach of the Agreement by either party, the Agreement provides that:

No party shall have the right to terminate this Agreement or sue for breach of this Agreement until it gives written notice of the alleged breach to the other party and a period of five (5) business days (in the country wherein the breach occurred) to cure the breach and such period elapses period elapses without such cure, unless the breach is of such a nature that it cannot be cured. In that case, termination or suit may proceed immediately.... (*Id.* ¶ 16.)

The term of Agreement ran from the date of the "publication of the October 2005 issue of major print media through December 31, 2006." (*Id.* ¶ 1.) The parties had a mutual option to renew the Agreement on the same terms and conditions for an additional fifteen months—that is, either party could elect to renew, and if the other party agreed, the term of the Agreement would be extended for an additional fifteen months. (*Id.* ¶ 6.) If the parties did not both agree to renew on the same terms and conditions, the Agreement would expire at the end of 2006.

The Agreement contained a very limited non-compete. If RW offered to renew on the same terms and conditions but Theron declined, then Theron agreed not to endorse or advertise any brand of watch, and any watches or jewelry produced by an enumerated list of high-end watch brands, for a period of for one year, or until the end of 2007. (*Id.*)

The Agreement was signed by both parties. Theron signed the document "On behalf of Denver & Delilah Films (Artist)." Olivier Bernheim ("Bernheim"), Raymond Weil's CEO, signed "On behalf of Raymond Weil (RW)."

Neither party sought to exercise the extension option under the Agreement. Instead, the parties opened negations in the spring of 2006 about terms for a new agreement. (Drescher Aff. Ex. 5 (hereinafter "Rush Dep.") at 90:1–18.) According to Bernheim, RW did not seek to extend the terms of the old deal because there were terms RW wanted to modify if it

went forward with Theron. (Drescher Decl. Ex. 52 (hereinafter "Bernheim Dep.") at 182:11–18.) However, negotiations broke off in August 2006 and no new deal was signed. (Rush Dep. at 92:19–23.)

The original Agreement was allowed to expire on December 31, 2006.

Since RW had not sought to extend the Agreement, Theron's one year non-compete was never triggered.

## II. The Instant Action

RW sued Theron and DDF (collectively, "Defendants") on February 5, 2007, well after the Agreement had expired by its terms. It alleged that Theron had breached the agreement on several occasions during its term, and that Defendants had fraudulently induced RW to enter into the Agreement in the first place. RW sought to recover all sums previously paid to Theron under the Agreement, as well as all monies expended by RW for the Shine watch advertising campaign, all monies paid to Defendants by competing manufacturers to promote their products, and such other damages as may appropriately be awarded in a case of this nature. (Compl. ¶ 30.)

Defendants filed an answer denying the allegations in the complaint and asserting eleven boilerplate affirmative defenses like failure to state a claim, improper venue, and laches. (Eilender Decl. Ex. B (hereinafter "Answer").)

### A. Alleged Breaches of the Agreement

In the Complaint, Plaintiff alleged four instances of breach of the Agreement. RW has since abandoned two of the four: Theron's posing with faux canary diamond earrings for a J'adore Dior Perfume advertisement, and her wearing a dog-tag type necklace for the ALDO Fights AIDS Campaign. (Pl.'s Opp'n. Mem. at 14.) The other two alleged instances of breach are described more fully below.

### 1. The Montblanc Incident

Montblanc sells luxury goods, primarily writing instruments, but also watches, leather goods and, more recently, women's jewelry. (Eilender Decl. Ex. V (hereinafter "Bostel Dep.") at 6:7–15.) In the fall of 2006, Montblanc launched a line of silver jewelry. (*Id.* at 18:13–22.) As a promotional device for this launch, Montblanc partnered with the Entertainment Industry Foundation ("EIF"), a charity. EIF promised to secure the participation of a celebrity to be part of Montblanc's advertising campaign, in exchange for a donation to EIF from Montblanc. (*Id.* at 11:13–12:11.) Theron agreed to appear in a promotional piece for EIF, which would identify Montblanc as the sponsor. (Defs.' Rule 56.1 Statement ¶ 26; Bostel Dep. at 12:19–13:14.) In exchange, Montblanc agreed to pay EIF two-hundred and fifty thousand dollars. (Bostel Dep. at 12:12–16.) This agreement was never reduced to writing. (*Id.* at 77:12–78:19.) Nonetheless, Theron participated in a photo shoot with the purpose of creating an image for the venture. (*Id.* at 38:19–21.)

After looking at test Polaroid photographs of Theron wearing a Montblanc necklace during the photo shoot, Montblanc decided to photograph the actress without jewelry and then later superimpose a necklace, believing that this would produce this most in-focus image of both Theron and the Montblanc necklace. (*Id.* at 50:11–51:8.) The finished product was incorporated into an approximately fourteen foot high poster. (*Id.* at 85:7–8.)

Montblanc believed that it had received permission through EIF to display that poster of Theron with the Montblanc necklace draped over her forearm at the 2006 Salon International de La Haute Horlogerie ("SIHH") in Switzerland. (*Id.* at 74:11–

75:23.) The SIHH is a prestigious watch and jewelry trade show and exhibition, lasting six days, at which a select number of jewelers and watch makers display their new products. (*Id.* at 66:24–67:15.) From about April 3, 2006 to April 5, 2006, the poster was hanging up at the Montblanc booth. (Defs.' Rule 56.1 Statement ¶ 30.) According to Montblanc, the image was only displayed inside booth, such that it was not visible to visitors passing by and was exposed only in one key entrance area. (Eilender Deck Ex. N, E-mail from Bostel to EIF employee Judi Ketch.) Nonetheless, the poster was up and people at the SIHH undoubtedly saw it.

After the poster had been on display for about two or three days, RW notified DDF that defendants were in breach of paragraph 8 of the Agreement. (Rush Opp'n. Decl. ¶¶ 37–41.) DDF immediately mobilized its lawyers, who persuaded Montblanc to take the poster down. (*Id.*) The poster was removed sometime between fourteen and thirty-six hours later—within the five day cure period provided for in the Agreement. (Defs,' Rule 56.1 Statement ¶ 31; Bernheim Dep. at 332:3–10.)

As far as the court knows, RW made no effort to terminate the Agreement once the poster was removed.

### 2. The South by Southwest Film Conference and Festival

On March 14, 2006, Theron attended a screening of East of Havana, a documentary film Ms. Theron produced through DDF, at the South by Southwest Film Festival ("SXSW"), an annual, regional film festival held in Austin, Texas. (Defs.' Rule 56.1 Stmt. ¶ 38.) Theron, together with the producers of other films featured at the festival, participated in a panel discussion before an audience that included members of the public and professional photographers. (Eilender Decl. Exhibit X (hereinafter "Kerver Dep.") at 23:22–24:3). Theron wore a Christian Dior ("Dior")

watch to the press conference (*Id.* ¶ 40; Pl.'s Rule 56.1 Stmt ¶ 19.)—a decision she now calls "regrettable." (Drescher Aff. Ex. 4 (hereinafter "Theron Dep.") 83:10–13.)

Theron is one of the world's most beautiful women—she has even been named "The Sexiest Woman Alive" by Esquire Magazine—and many photographs were taken of her during the press conference. (Eilender Decl. Ex. AA.) Some of those photographs showed Theron wearing the Dior watch, and some of those photos were posted to a website called "Wireimage"—essentially a clearing house for professional photographers (Kerver Dep. at 51:2–13.) When someone sees an image on Wireimage that he wants to use, he downloads it and pays a fee, which is split between the photographer and the proprietors of Wireimage. (*Id.* at 51:14–56:7.) Once a photographer has uploaded an image to Wireimage, she does not control, or necessarily even know, who will subsequently use the image or how. (*Id.* at 51:2–13.) The celebrity depicted apparently knows even less.

One of several third parties to download the image of Theron wearing the Dior watch was LVMH Watch and Jewelry USA, another maker of luxury goods and the owner of Dior watches. (*Id.* at 55:18–23,) LVMH submitted the image to Tourneau LLC "Tourneau," a prominent retailer and manufacturer of high end watches. (Eilender Decl. Ex. T, E-mail chain between LVMH employee Stephanie Cranston and Tourneau Marketing Coordinator Sandy Madera). Tourneau is among the leading retailers of almost every brand of watch it carries based upon annual volume (Eilender Decl. Ex. Y (hereinafter "Block Dep") at 4:19–22; 5:7–9.) Tourneau carries both RW and Dior watches in its inventory. (*Id.* 5:10–14.)

Tourneau publishes an in-store annual called the *Tourneau Times,* which is mailed to about one hundred thousand, high-spending Tourneau customers and is made available free of charge in Tourneau retail locations. (*Id.* 5:18–24; 95:11–20 (attached as Ex. 13 to Drescher Aff.).) The October 2006 *Tourneau Times* ran a photograph taken at the SXSW Festival depicting Theron wearing the Christian Dior watch on her wrist, (Def. Rule 56.1 Stmt. ¶ 43.) The photograph of Theron in the Dior watch appeared on page fifteen of the publication in the "Star Watch" section, over a caption that reads, "Charlize Theron wears Dior." (*Id.*) RW became aware of the image of Theron in the *Tourneau Times* in November of 2006. (Bernheim Dep. 86:20–22.)

In the same issue of the *Tourneau Times* RW ran an advertisement RW Shine watches featuring the model Telma Thormasdittor. At the time the magazine appeared, DDF claims it had not relaxed the prohibition against RW's use of other female artists in *print* advertising, although it had granted RW permission to use other female artists in certain indoor and outdoor durable transparency or "duratrans" advertising. (Rush Decl. Ex. 29, E-mail from RW affiliate employee Gil Ozir to Gretchen Bruggeman Rush; Ex. 30 E-mail From Gretchen Bruggeman Rush to Gil Ozir.) Thus, the use of the photographs of Thelma Thormasdittor is at least arguably a breach of RW's covenant not to use any other female artists to endorse its products in Europe and the United States during the term of the Agreement. However, Defendants have not asserted a counterclaim to this effect.

### 3. Other Alleged Breaches of the Agreement

RW alleged in its Complaint that other instances of breach might come to light during discovery. (Compl.¶ 21.) RW did not move for leave to amend its pleading to· assert other breaches by defendants, but did insert three other alleged instances of breach into the Joint Pre–Trial Order.

#### i. Chopard

Theron, on behalf of DDF, entered into a contract with Mylestone Promotion Limited, as an agent for Chopard, to wear Chopard Jewelry to the 2006 British Academy of Film and Television Arts ("BAFTA") Awards and the 2006 Academy Awards. (Eilender Opp'n. Decl., Ex. II, contract between Mylestone Promotion Limited and DDF (hereinafter the "Chopard Contract").) Under the Chopard Contract, Theron undertook to wear at least two pieces of Chopard jewelry of her choosing out of specified combinations (*e.g.* an earring and necklace pairing or earrings and bracelet etc.) to each award show. (*Id.* ¶ 3.) A Chopard watch was not among the items Theron could choose to wear under the contract. Theron was to be paid $50,000 for wearing the jewels to the BAFTA Awards and $200,000 for the Academy Awards. (*Id.* ¶ 10.) Chopard and DDF also agreed that:

> In the event that Miss Theron wears Chopard Jewelry to such appearance, the parties agree that all photographs taken of Miss Theron at the BAFTA Appearance and The Academy Awards Appearance, as applicable and *subject to Chopard's obtaining all third party authorization and/or clearance,* may be used for a period of up to twelve (12) months following each respective appearance for editorial purposes only on a worldwide basis, in the print media and in connection with Chopard's own information magazine "Happy News." (*Id.* ¶ 4) (emphasis added).

Theron wore Chopard jewels to both the BAFTA and the Academy Awards. In April 2006 attorneys for Theron discovered that photos of Theron had been posted on the Chopard website. (Eilender Opp'n.

Decl. Ex. JJ, E-mail chain between Chopard employee Caroline Schreiber and Gretchen Bruggeman Rush.) Theron's attorney's requested that Chopard removed the photos as an unauthorized use of Theron's name and likeness. Chopard complied. (*Id.*)

### ii. Cartier

Theron wore Cartier diamond stud earrings and a flower cuff bracelet to the 2006 Golden Globe Awards. (Eilender Opp'n. Decl. Ex. KK (hereinafter "Borchers Dep.") at 32:17–20.) Theron was loaned the pieces, which were then returned to the Cartier Museum following the event. (*Id.* 35:7–9.) She did not wear a Cartier watch.

Theron was not paid for wearing the Cartier jewels. However, she has previously received valuable Cartier pieces as gifts from the company. (*Id.* 22:10–13.) A Cartier employee testified that Theron has received a $35,000 ring, a $7,500 bracelet and $8000 earrings as past "tokens of appreciation." (*Id.* 23:11–13; 23:19–23; 24:19–22.)

### iii. Breil Milano

In June 2007, well after the expiration of the Agreement, DDF entered into an endorsement contract with Binda Italia, pursuant to which it agreed that Theron would promote Breil Milano brand watches and jewelry. (Def. Rule 56.1 Stmt. ¶ 49.) RW contends that this, too, breached the Agreement.

## B. Fraud

In addition to breach of contract, RW also charged fraud in the inducement in its Complaint, alleging that:

Upon information and belief, at the time the defendants signed the agreement they knew but did not reveal to the plaintiffs that CT [Theron] had committed to others to promote their products, including Dior, or would accept offers to promote such products.

At the time the defendants induced plaintiffs to enter the agreement and pay the defendants substantial sums of money, the defendants knew that CT would promote other watches, had no intention of complying with the terms of the agreement with plaintiffs, and was simply making representations to the plaintiffs in order to have them pay her substantial sums of money.

Had plaintiffs known of CT's other commitments with competing manufacturers, and that CT would not honor the exclusivity clause of the agreement, they would not have paid her any money; would not have spent millions of dollars on an advertising campaign to promote her image with plaintiff's goods; and would not have entered into an agreement with the defendants.

By reason of defendants' fraud and misrepresentations to the plaintiffs, plaintiffs were induced to enter into the purported exclusive agreement with the defendants which provided for substantial penalties if the plaintiffs breached the agreement. (Compl. ¶¶ 32–35.)

## DISCUSSION

As noted above, RW now moves for partial summary judgment on its breach of contract claim and Defendants move for summary judgment on RW's claims for breach of contract and for fraud. Defendants also move to strike the expert reports submitted by RW on the issue of damages for breach of contract, while RW moves to dismiss most of the boilerplate affirmative defenses inserted into the answer by Defendants.

## I. Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is properly

granted when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The language of the rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548. It is apparent that in such a situation "there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Id.* at 317, 106 S.Ct. 2548.

In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotations omitted). It is the task of the court "not to resolve issues of fact but only to determine whether there are issues to be tried." *Balderman v. United States Veterans Admin.,* 870 F.2d 57, 60 (2d Cir.1989).

Since this Court's jurisdiction is based on the diversity of the parties, New York State substantive law applies. *See, e.g., DeWeerth v. Baldinger,* 38 F.3d 1266, 1272 (2d Cir.1994).

## II. Plaintiffs Fraud Claim is Dismissed

RW asserts a claim for fraudulent inducement in its complaint. This claim fails as a matter of law and for lack of any evidence to support it. Defendants' motion for summary judgment dismissing it is granted.

■■■ To establish fraud under New York law, "a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, and (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs.,* 98 F.3d 13, 19 (2d Cir.1996), *quoting Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 153 (2d Cir.1995). In a breach of contract claim, which also alleges fraud "a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract." (*Id.* at 20) (internal citations omitted). There is no suggestion that Theron had any legal duty to RW separate from her duty under the Agreement. Rather, RW argues that Defendants made a fraudulent misrepresentation about one of two things—Theron's intent to abide by the terms of the Agreement or her existing relationships with other jewelry and watch manufacturers—in order to induce RW to enter into the Agreement in the first place; either contention saves the claim.

■■■ It is well settled that a claim for fraud that merely alleges an undisclosed intention from the outset of an agreement not to comply with its terms is insufficient as a matter of law. *See generally Papa's–June Music, Inc. v. McLean,* 921 F.Supp. 1154, 1162 (S.D.N.Y.1996); *McKernin v. Fanny Farmer Candy Shops, Inc.,* 176 A.D.2d 233, 234, 574 N.Y.S.2d 58, 59 (N.Y.App.Div.1991); *Trell v. Am. Assoc. for the Advancement of Sci.,* No. 04–

0030E(SR), 2007 WL 1500497, at *7 (W.D.N.Y. May 21, 2007.) RW cannot, with a naked assertion that Defendants " 'had no intention of complying with the terms of the agreement with plaintiffs,' " shoehorn a claim of fraud into a basic breach of contract dispute. (Compl. ¶ 33.)

RW offers not a scintilla of evidence to support its barebones allegation in the complaint that Defendants misrepresented or concealed some pre-existing arrangement between Theron and one or more of RW's competitors. Therefore, that cannot possibly serve as the basis for a fraudulent inducement claim.

No doubt recognizing the deficiency of its fraud claim, RW does not even attempt to rebut the arguments made by Defendants in support of its motion for summary judgment in its favor.

Summary judgment is granted for Defendants on RW's second claim for relief for fraud.

### III. Plaintiff's Breach of Contract Claim Is Dismissed only in Part

#### A. Theron's Motion for Summary Judgment Dismissing her as a Party is Denied.

The parties dispute whether Theron was properly named a party defendant in this lawsuit. Defendants argue that the only contracting party was DDF, and that Theron signed the Agreement with RW solely in her capacity as an agent of DDF, not in her own right. (Defs.' Mem. of Law. at 13.) They urge that it was not possible for Theron to breach the contract, and they move for summary judgment dismissing her as a party defendant on those claims. (*Id.*)

■ Under New York law, "an agent signing an agreement on his principal's behalf, will not be found personally liable under the terms of the agreement unless there is a clear and explicit evidence of the agent's intention to substitute or superadd his personal liability for, or to, that of his principal." *Mason Tenders Dist. Council Welfare Fund v. Thomasen Constr. Co.,* 164 F.Supp.2d 379, 381 (S.D.N.Y.2001) (*quoting Lerner v. Amalgamated Clothing & Textile Workers Union,* 938 F.2d 2, 5 (2d Cir.1991)). To determine whether an agent signing on behalf of a corporation will nonetheless be found personally liable, New York courts and other courts in this Circuit applying New York law, have considered various iterations of the following factors: (1) the length of the contract; (2) the placement of the liability clause relative to the signature line; (3) the appearance of the signatory's name in the agreement itself; (4) the nature of the negotiation that surrounded the contract; and (5) the signatory's role in the company. *Id.*; *Paribas Prop., Inc. v. Benson,* 146 A.D.2d 522, 525–26, 536 N.Y.S.2d 1007 (1989); *Cement and Concrete Workers Dist. Council v. Lollo,* 35 F.3d 29, 35 (2d Cir.2001).

In *Porter v. Property Damage Control Group,* PDC, construction corporation entered into a contract with homeowners to do construction work on their house. No. 03 CV 5972, 2007 WL 2907403 at *9 (E.D.N.Y., Sept. 28, 2007). The court agreed with the magistrate's recommendation that, Roberts—the president and sole shareholder of the construction corporation—be found individually liable under the contract, in spite of the fact that he had signed the contract only in his capacity as "President/Owner" of PDC and that he had testified he "did not *intend to* bind himself personally." *Id.* (emphasis added). In making its determination the court considered that Roberts, as the President and sole shareholder, holds a "pivotal role" in PDC; that the contract identified Roberts as a party on its first page "as opposed to providing a boilerplate clause that the offi-

cer signing on the corporation's behalf was personally bound;" Roberts was involved in the contract negotiating process; and the length of the contract was relatively short. *Id.*

■ Similarly, despite Theron's contention that she did not intend to become personally bound by the Agreement, this is patently not a situation where "a single sentence in a lengthy contract created a trap for an unwary agent" warranting against the possibility of individual liability. *Paribas,* 146 A.D.2d at 525, 536 N.Y.S.2d 1007. Applying the factors discussed above, it is obvious that Theron cannot be dismissed as a defendant on the breach of contract claim. She was not an unwary agent signing on behalf of a principal, but the very object of the Agreement agreeing (albeit through the medium of a personal services corporation) to lend HER celebrity to RW. Theron is the owner of DDF and therefore exercise considerable control over its corporate decisions. The agreement was only ten pages long, and Theron marked every page with her initials. Indeed, Theron even testified that she personally participated in the negotiations for the contract. (Theron Dep. at 40:13–21.)

Additionally, the title of the Agreement is "Denver & Delilah Films, Inc. (Lender) for the Services of Charlize Theron (Artist) 2005–2006 Agreement with Raymond Weil (RW)" (Agreement at title line) and the only services under the Agreement are to be provided by "Artist" (Theron). (*Id.* ¶¶ 4, 6, 7, 8, 9, 10, 11, 15, 16, 17, 20.) At the end of the Agreement, just above the signature block, it states, "[t]his agreement shall bind and inure to the benefit of Artist[Theron]." (*Id.* ¶ 20.) While this language is comparable to language described as "boilerplate" in *Porter*[1], it is not

in view of the signature block itself. Theron signed "on behalf of Denver & Delilah Films (Artist)." That is, she signed of behalf of both the corporation and herself individually, not just in her capacity as president of the corporation. Her signature is not followed by the addition of any corporate title. The conclusion is inescapable that the parties intended Theron to be bound personally and that she signed the Agreement in both her corporate and personal capacities.

Theron's motion for summary judgment dismissing her as a party defendant (at least on the breach of contract claim) is denied.

### B. Defendants' Motion for Summary Judgment as to the Montblanc Incident is Granted

■ The display of the poster of Theron holding the Montblanc necklace at the SIHH, a prestigious watch and jewelry trade show, constituted a breach of the Agreement between RW, Theron and DDF. While the parties dispute exactly what Theron knew about the final image used in the poster, it is clear from the record that Theron loaned her image to a purpose that was forbidden under the Agreement—to promote and advertise Montblanc silver jewelry. The fact that the image was to be used for charitable purposes does not excuse Defendants' breach, because paragraph 8 of the Agreement specifically states that Theron will not "endorse or advertise watches or jewelry for any other person, entity or company, *including for charity*" during the term of the Agreement. (Agreement ¶ 8) (emphasis added).

However, the Agreement permitted a breaching party to cure within five days

---

1. The court in *Porter* cautioned against the finding of individual contractual liability based only upon "a boilerplate clause that the officer signed on the corporation's behalf was personally bound." 2007 WL 2907403 at *9.

and the breach—the public display of the poster with Theron's image and the necklace at an event promoting Montblanc products—was, in fact, remediated within five days after RW notified DDF of the breach. Therefore, RW's claim for breach of contract on this score must be dismissed.

The contract provides that

No party shall have the right to terminate the Agreement or sue for breach of this Agreement until it gives written notice of the alleged breach to the either party and a period of five (5) business days (in the country where the breach occurred) to cure the breach and such period elapses without such cure, unless the breach is of such a nature that it cannot be cured. In that case, termination or suit may proceed immediately. (Agreement ¶ 16.)

The point of drafting a contract with a cure period provision is to allow the parties, in the event of breach, to correct their course and maintain the promises in their contract. "The concept of cure is grounded in the belief that protecting expectations while avoiding waste is, or should be, a primary goal of contract damages. The basis for the cure concept stems from the notion that our remedial system encourages parties to enter contracts by giving damages based on the benefit of the bargain for disappointed expectations, than rather than trying to deter contract breaches through compulsion or punishment." William H. Lawrence, *Cure after Breach of Contract Under the Restatement (Second) of Contracts: An Analytical Comparison with the Commercial Code*, 70 Minn. L.Rev. 713, 727 (1986) (internal quotations and citations omitted).

RW argues that the cure provision is irrelevant, because the breach was of the incurable variety. It notes that the people who saw the poster while it was hanging cannot "un-see it." (Pl.'s Opp'n. Mem. at 20.) RW misidentifies the breach. It is not the act of viewing the poster by third parties that constitutes the breach—third parties are not bound by the Agreement and so cannot breach it. It is, rather, Theron's participation in Montblanc's advertising campaign and charitable promotion that breaches the contract. That breach is perfectly curable, as demonstrated by the fact that the breach was cured: the poster was taken down. This satisfied RW at the time; Bernheim, the company's CEO, testified at his deposition that he considered the removal of the Montblanc poster to be an adequate cure of the breach. (Bernheim Dep. at 351:11–352:1.) In view of Bernheim's admission, it is difficult to see why RW persists in arguing that Theron's breach is actionable. It is not.

Defendants' cross motion for summary judgment dismissing the breach of contract claim insofar as it is predicated on the Montblanc incident is granted. RW's motion for summary judgment on this issue is denied.

### C. Plaintiffs Motion for Summary Judgment as to the Dior Watch Incident Is Granted in Part

By wearing a Christian Dior watch at a film festival, Theron breached her covenant not to "wear publicly any other watches other than RW." Theron recognizes as much, calling her decision to wear the watch "regrettable." It was more than "regrettable;" it was a clear breach of the Agreement.

Defendants' contention that Theron only wore the Dior watch for "about one hour of the fifteen month contract term" (Def.Opp'n.Mem. p. 17) is an obvious effort to render the breach immaterial. But clearly it was not: Theron was photographed wearing the watch; the photographs ended up on the Internet, where

they were sold to a competitor of RW, which made sure that they were used to promote its products. Since the essence of the contract is Theron's agreeing to represent RW exclusively during the term of the Agreement, a breach, however fleeting, that resulted in the use of Theron's image in connection with another manufacturer's watch cannot be deemed immaterial.

Theron cannot hide behind the fact that she had no control over what the photographers did with the pictures they took at the panel discussion, or of the use that customers of the web site made of photographs they purchased. Her breach was wearing the watch. Subsequent uses over which she had no control are relevant, not to the issue of breach, but to the issue of damages.

Moreover, it was foreseeable to Theron—a famous movie star—that photographs of her would be made available for purchase and that they might appear in publications. Her lack of involvement in what happened with the pictures does not mean she is not culpable for any damage they caused to RW.

Therefore, RW's motion for partial summary judgment on the issue of liability for breach is granted to the extent of the claim arising out of the Dior watch incident and its subsequent use, and Defendants' motion for summary judgment on that claim on the issue of actual breach is denied.

Proof of damages will be discussed below.

### D. New Claims for Breach of the Agreement

RW never moved to amend its complaint to include claims for the three additional alleged breaches of the Agreement that are identified above: Chopard, Cartier and Breil Milano. However, had such a motion been made it would have been denied as futile since none of these incidents breached the Agreement.

### 1. Breil Milano

Six months after the Agreement with RW expired, DDF entered into a new deal with Binda Italia whereby Theron would promote Breil Milano brand watches and jewelry. Theron and DDF were therefore completely free to enter into endorsement deals with other parties. Because RW did not offer to extend the Agreement for an additional fifteen months—a point about which there is no dispute—the provision of the Agreement that would have imposed a non-competition agreement on Theron for the year 2007 was never activated. RW's CEO, Bernheim, understood that the deal with Binda Italia was not a breach of the Agreement at his deposition:

Q (by Mr. Baute): Okay. Is the contract that Charlize Theron signed with Breil Milano in 2007 a breach of contract?

A (Mr. Bernheim): No.

Q: Why not?

A: Because our, because our contract was ended. Our contract was to be at its end.

Q: So she was free to sign a new watch deal with whoever she wanted, right?

A: Yes.

Q: Including in 2007, right?

A: Yes. (Bernheim Dep. at 194:20–195:6.)

The endorsement deal between DDF and Binda Italia did not breach the Agreement between Raymond Weil, Theron and DDF. Any motion to amend the complaint to add this specific claim would have been denied as futile.

### 2. Cartier

Theron wore Cartier jewelry to the 2006 Golden Globes. The contract specifically carves out an exception such that Theron

"is permitted to wear jewelry of her choice in public *and to awards shows* during the Term." (Agreement ¶ 8) (emphasis added). Theron was not permitted to wear watches manufactured by other companies during the Term, even to awards shows—the drafters clearly distinguished between "watches" on the one hand and "jewelry" on the other. However, there is no evidence that Theron wore a Cartier watch to an awards show—rather, she wore a bracelet and earrings. The fact that she has received rather extravagant "gifts" from Cartier over time—gifts that could be construed as payment for wearing the jewelry—is of no moment, because nothing in the Agreement bars Theron from being paid to wear jewelry of her choosing to awards shows. Indeed, one of the attorneys representing Theron and DDF in negotiations for the Agreement with RW testified, without contradiction, that Defendants deleted language from an early draft of the Agreement that would have restricted the use of Theron's name and likeness in connection jewelry precisely because Theron and DDF anticipated the possibility that she might be paid to wear jewelry at award shows. (Rush Dep. at 66:24–72-24.)

Had RW moved to amend the complaint to include a claim based on the Cartier incident, the motion would have also have been denied as futile.

### 3. Chopard

Also in 2006, Theron wore Chopard jewelry—again, not a watch—to the British and American Academy Awards. She was paid a fee for wearing the jewelry, and she gave Chopard the right to use photographs taken of her while wearing the jewelry for limited, print editorial purposes, provided Chopard received necessary third-party clearances. Neither the fact that Theron wore the Chopard jewelry nor the fact that she was paid for doing so constitutes a breach of the Agreement. Again, the Agreement clearly permits her to wear whatever jewelry (not watches) she likes to any awards show, and it contains no prohibition on her being paid for doing so.

The provision in the Chopard Contract with Chopard that permits Chopard to use photographs taken of Theron does not run afoul of the exclusivity provision of the Agreement as it requires Chopard to get authorization from "all third parties," which would include those with whom Theron has contractual obligations, prior to using photographs of Theron in Chopard jewelry. However, Chopard did not secure authorization from Theron or from third party RW—as it was required to under the Chopard Contract—before it posted the photographs of Theron in Chopard jewelry to its website. Moreover, the Chopard Contract only contemplates the use of photographs of Theron for *print*, as opposed to, electronic media. Chopard's posting of the photographs, therefore, was a clear breach of its contract with DDF. However, there was an immediate cure of such breach under the Agreement when Theron's attorney's directed that such photos be removed.

Therefore, had RW moved to amend the complaint to include a claim based on Theron's relationship with Chopard, the motion would have similarly been denied as futile.

### E. Damages and Defendants' Motion to Strike Expert Report

The question of material fact which must be submitted to a jury is whether the breach resulted in any damage to Plaintiff, as required by New York law, which holds that "a party seeking recovery for breach of contract must show: (1) a contract; (2) performance by the party seeking recovery; (3) breach of the contract by the other party; and (4) damages attributable to the breach." *Maguire Co., Inc. v. Her-*

bert Constr. Co., Inc., 945 F.Supp. 72, 75 (S.D.N.Y.1996).

In its ad damnum clause, RW seeks repayment of all monies paid to DDF under the contract, as well as all monies paid to Theron's modeling agent and the monies it expended on the worldwide advertising campaign featuring Theron. At a hearing in front of the Hon. Theodore Katz, counsel for Plaintiff announced that RW was abandoning the last two elements of its damages, and that it would limit its claim to the $3 million paid to Theron under the Agreement, plus interest, as well as money spent promoting her. (Drescher Aff. Ex. 19, Sept. 21, 2007 Hearing Transcript 42:12–19.). In the Joint Pre–Trial Order, RW adds the money paid to Theron by Chopard and Breil Milano and the value of any jewelry given to Theron by Cartier. However, there can be no recovery in connection with these incidents, since RW has no viable claim for breach of the Agreement in connection therewith.

The principal damages that RW seeks— a return of all monies paid under the Agreement and spent in promoting the Theron advertising campaign—are equivalent to damages that would be awarded if the contract were rescinded. RW is not entitled to such damages.

The Second Circuit has held that, "... before rescission will be permitted the breach must be 'material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract,'" *Septembertide Publishing, B.V. v. Stein and Day, Inc.* 884 F.2d 675, 678 (2d Cir.1989), *quoting Callanan v. Powers,* 199 N.Y. 268, 92 N.E. 747 (N.Y.App.Div.1910). Absent fraud or mistake, rescission may be granted only when the breach goes to the root of the contract and defeats its very purpose. *Babylon Assocs. v. County of Suffolk,* 101 A.D.2d 207, 215–217, 475 N.Y.A.2d 869 (1984).

■ Moreover, the remedy of rescission "is to be invoked only when there is lacking complete and adequate remedy at law and where the status quo may be substantially restored." *Strategic Growth Intern., Inc. v. RemoteMDx, Inc.,* No. 06–3915, 2008 WL 4179235, at *5 (S.D.N.Y. Sept. 10, 2008), *quoting Rudman v. Cowles Commc'ns, Inc.,* 30 N.Y.2d 1, 13, 330 N.Y.S.2d 33, 280 N.E.2d 867 (1972). In other words, rescission must return the parties to the same position they would have occupied had there been no contract. In an action by a corporation for the return of the fee paid to an investment bank for its services in a corporate restructuring following incidents of third party insider trading, this court held that rescission was not available, because "... plaintiff has realized and paid for the full benefit of the contract" and "[t]here are no obvious means to undo the entire restructure transaction." *In re Ivan F. Boesky Sec. Litig.,* 825 F.Supp. 623, 637 (S.D.N.Y. 1993). *See also Stahl Management Corp. v. Conceptions Unlimited.,* 554 F.Supp. 890, 894 (S.D.N.Y.1983).

■ In this case, the Agreement cannot be rescinded and the parties returned to the status quo. The Agreement is no longer operative. While it was operative, Theron loaned her image to RW, which realized substantial benefits of an indisputably successful advertising campaign featuring Theron. (Bernheim Dep. at 48:14–17.) Theron's brief appearance wearing a Dior watched, which led to her image's being published in the Tourneau magazine in the thirteenth month of the Agreement's fifteen month term, was a material breach, but it was not so substantial and fundamental as to defeat the object of the parties in making the contract. Indeed, the Agreement was almost at an end by the date of publication of the Tourneau Times; in the months preceding that

publication, RW received substantial benefits under the Agreement, which it cannot give back. And RW had the absolute right to terminate the Agreement in order to redress this breach, but it did not do so. Therefore, RW is not entitled to the recessionary damages it seeks. "Absent grounds for rescission ... [plaintiff] has only the right to compensatory damages for breach of the agreement." *Affiliated Hosp. Prod., Inc. v. Merdel Game Mfg., Co.*, 513 F.2d 1183, 1186 (2d Cir.1975). The fact that RW is not entitled to rescissionary damages does not mean that it is not entitled to *any* damages. Under New York law, "It is a well-settled tenet of contract law that even if the breach of contract caused no loss or if the amount of the loss cannot be proven with sufficient certainty, the injured party is entitled to recover as nominal damages a small sum fixed without regard to the amount of the loss, if any." *Medinol Ltd. v. Boston Sci. Corp.*, 346 F.Supp.2d 575, 599 (S.D.N.Y. 2004), *quoting ESPN, Inc. v. Office of the Comm'r of Baseball*, 76 F.Supp.2d 416, 421 (S.D.N.Y.1999).

█ Since RW is entitled to partial summary judgment on the issue of breach, it has the right to go to trial to prove whatever damages it can prove—and, if it can prove none, to an award of nominal damages. RW must now, however, propound a non-recessionary theory of damages that it intends to use at trial.

In its opposition to Defendants' motion for summary judgment, RW proffers two expert reports on the issue of damages. Defendants move to strike those reports, and urges that, in their absence, there is no evidence of damages, so DDF and Theron are entitled to summary judgment despite any actionable breach.

I deny the motion for summary judgment on the ground that RW has failed to prove damages.

The first of RW's expert reports comes from Dr. Jacob Jacoby, a professor of consumer behavior and retail management at New York University's Stern School of Business. (Eilender Opp'n. Deck, Ex. PP (hereinafter, "Jacoby Report.") ¶ 4.) Dr. Jacoby opines that due to Theron's actions the value of RW's advertising campaign should be discounted by at "least a half." (*Id.* ¶ 28.) He reasons that:

Especially when considered cumulatively, Ms. Theron's actions ... during the contract period seriously undermined the more than $10,000,000 advertising campaign for Raymond Weil watches that was implemented during the contract period. In addition to substantially diminishing the value of the entire campaign, Theron's actions likely also caused long term harm to the Raymond Weil image and brand equity among the consuming public and especially among members of the trade. (*Id.* ¶ 3.)

Dr. Jacoby has impressive credentials as an expert in advertising, marketing and consumer research and is the sort of witness whose testimony would be offered— and admitted—at a trial on the issue of what damages flowed from Theron's breach of the Agreement. However, Dr. Jacoby's report must be revised. He bases his conclusion on the cumulative effect of multiple breaches, but the Court has concluded that Defendants committed only one actionable breach. Therefore, Dr. Jacoby should be given a chance to revise his conclusions in light of the legal rulings that have narrowed Plaintiff's case considerably.

Dr. Jacoby also propounded what I take to be an alternative theory of damages— liquidated damages in the amount of one million per breach, which would be one million, since there is only one actionable breach. The Court is deeply skeptical as to the empirical basis for this "what's good

for the goose is good for the gander" theory of damages, which is nothing more than a post-hoc attempt to revise the Agreement.

 Moreover, "a liquidated damage clause must be the result of an express agreement between the parties; courts will not read such a clause into a contract by implication." *Ohanian v. Avis Rent A Car Sys.*, 779 F.2d 101, 109 (2d Cir.1985). *citing Winkelman v. Winkelman*, 208 A.D. 68, 70, 203 N.Y.S. 63 (N.Y.App.1924). Here, the parties have *only* provided for a liquated damages in the event of *RW*'s breach of the Agreement "relating to the usage of Artist's [Theron's] name and/or likeness" in the amount of "one million U.S. dollars" per breach. (Agreement ¶ 16.) Thus, liquidated damages are unavailable for the single, actionable breach committed by Defendants.

However, in light of the fact that the issue of damages must be revisited in view of other rulings, there is no basis to make final admissibility determinations at this time.

The motion to strike Dr. Jacoby's testimony entirely is denied on the condition that the expert report be revised.

RW is free to ask Dr. Jacoby to update his Report to reflect the rulings made above, if it intends to call him as a witness at trial. If Defendants still finds some aspect of his opinion objectionable, we will take it up via motion in limine at the final pre-trial conference. Please note: no expert's report will be admitted into evidence at the trial. Experts testify; their reports can be used to cross examine but are not independently admissible.

Plaintiff's other damages expert is Joseph Hunter, a former model turned modeling agent, who purports to have "basically created the promotion of super-models and how to maximize their income by obtaining endorsements for various products, such as cosmetics, jewelry, clothing, etc."

and to be an expert in the field of "celebrity endorsements." (Eilender Opp'n. Decl., Ex. QQ (Hereinafter "Hunter Report.")) Mr. Hunter opines as a result of Theron's association with other brands during the Agreement term, the Agreement was effectively converted into a non-exclusive arrangement, which by Mr. Hunter's account, would not have been worth more than two-hundred and fifty thousand dollars to RW. (*Id.*) Additionally, Mr. Hunter estimates that RW would not have spent more than one million dollars promoting a non-exclusive advertising campaign with Theron.

Again, this court will deny the motion to strike Mr. Hunter's evidence as "junk science," at least at this juncture. But Mr. Hunter also will have to examine his testimony to see how it is impacted by the court's various rulings. If RW proffers him as a witness for trial, he will have to prepare a new expert report, and we will deal with any purported defects in his credentials or his testimony at trial. Assuming his credentials to be what he says they are, the court would find that Mr. Hunter has relevant evidence, and the fact that his expertise does not lend itself to scientific replication does not undercut the relevance of his opinion, given the subject matter at issue. But I question whether his credentials are such as to allow him to offer an opinion on the amount of value lost to RW because of Theron's breach. I do not understand him to be an economist and am not clear about how many such deals he has put together or the basis for any calculations he makes about the association between breach and loss. But that is for another day.

## IV. The Affirmative Defenses

There is nothing dumber than a motion to strike boilerplate affirmative defenses; it wastes the client's money and the court's

time. But since RW has made such a motion, I have to rule on it.

The motion is denied insofar as it seeks dismissal of the first affirmative defense (failure to state a cause of action), because RW did fail to state a cause of action for fraud as asserted in the complaint. It is denied insofar as it seeks dismissal of the sixth affirmative defense—failure to mitigate damages—because we are having a damages trial, and a defendant can always allege failure to mitigate. The remaining boilerplate affirmative defenses against which RW moves are dismissed for the reasons argued in RW's brief.

Summary judgment is granted in favor of RW on its motion to dismiss Defendant's affirmative defenses two, three, five, seven, eight, nine, ten, and eleven.

### Concluding Matters

The Court refers this matter to The Honorable Theodore H. Katz for the purpose of conducting a pre-trial settlement conference. The conference may be scheduled at the convenience of the parties and Judge Katz, but it must take place before the end of October.

If the parties fail to settle the case, they shall file an updated Pre–Trial Order, reflecting all the rulings made by the court in this opinion, no later than November 7. Updated expert reports must also be filed by November 7.

We will hold a final pre-trial conference on December 5, 2008 at 2 p.m. The lawyers who are trying the case must attend this conference. They must be prepared to explain exactly who will testify at the trial and to commit to the witnesses they are going to call. Since this is a damages trial, each side will have one day to present its case; the parties should keep this in mind in designating witnesses. No witness who is not designated in the Pre–Trial Order may be called at trial; there is no option to "reserve the right" to call additional witnesses.

At the conference, the court will rule on all in limine motions and on all objections to documentary evidence, and will admit exhibits for trial. In other words, the conference is really the first day of the trial. Counsel must be prepared to argue their objections to evidence.

In limine motions, including motions to preclude witnesses from testifying, are due on November 21. Responses must be filed by December 5. I do not accept replies on in limine motions.

You will receive your trial date at the Final Pre–Trial Conference.

The parties may stipulate to try the issue of damages to the Magistrate Judge—in which case, all of these dates are off the table.

The Clerk of the Court shall mark the following motions as decided and shall remove them from the court's list of outstanding motions:

Plaintiff's Motion for Partial Summary Judgment (Docket # 42): Granted in part and denied in part.

Plaintiff's Motion to Strike Defendants' Affirmative Defenses (Docket # 42): Granted in part and denied in part.

Defendants' Motion for Summary Judgment (Docket # 43): Granted in part and denied in part.

Defendants' Motion to Strike Plaintiffs' Expert Reports (Docket # 54): Denied, with leave to renew after updated expert reports are submitted.

This constitutes the decision and order of the court.